Opinion delivered May 21, 1887.

No. 5466.

CHARLES CONNER *v.* THE STATE.

1. PRACTICE—EVIDENCE—PREDICATE sufficient to admit in evidence the written testimony of an absent witness taken upon the examining trial is laid when it is shown that the absent witness either lives out of the State or that he has removed beyond the limits of the State. In this case it was shown that the absent witness was an officer in the United States army; that he was temporarily on duty in the State at the time of the examining trial; that his command, at that time, was stationed in the Indian Territory; that since the examining trial he had left this State to go to the post where his command was stationed, and that, since

---

Statement of the case.

---

his departure, the witness proving the predicate had received a telegram from him announcing his arrival at his post. *Held*, a sufficient predicate to admit his written testimony.

2. PRACTICE IN THIS COURT.—This court has judicial knowledge of the fact that the Indian Territory is beyond the jurisdiction of this State.

3. PRACTICE.—CIRCUMSTANTIAL EVIDENCE is competent to establish the fact that an absent witness is beyond the limits or jurisdiction of this State.

4. SAME—EVIDENCE.—The rule of evidence which would require the State to produce a telegram as the best evidence of its contents, before resort-ing to secondary evidence to prove the same, obtains when the contents of the telegram become essential in determining the rights of parties to it. The object sought in this case was not proof of the contents of the telegram, but proof only of the independent fact that the telegram purporting to have been sent by the absent witness was received by the witness on the stand. *Held*, that the evidence was properly admitted.

5. MURDER—CHARGE OF THE COURT.—It is a settled rule of practice in this State that, to relieve the trial judge of the duty of charging upon the lower degrees of culpable homicide, the evidence must establish the highest degree; for the reason that if there be reasonable doubt it must be solved by the jury and not by the court. It would be error to charge that the jury must either convict of murder of the first degree or acquit, if by any possible legitimate construction of the evidence the jury might convict of the second degree.

6. SAME.—Stated in another form, the rule has been held to be, in effect, that a failure to define murder of the second degree, in a case where the jury upon the evidence might have found the defendant guilty of the less of-fense, will be cause for reversal whether the instructions were asked or not. In this case the jury returned a verdict of guilty in the second de-gree under the charge of the court defining that grade of murder, and the defendant has nothing to complain of.

7. SAME—SELF DEFENSE.—The charge upon self defense failed to instruct that reasonable appearances of danger must be judged of from the stand-point of the accused; but the defense asked no special charge to that effect, and the charge given presented the law applicable to the facts in proof. *Held*, no reversible error.

APPEAL from the District Court of Wheeler. Tried below be-fore the Hon. Frank Willis.

The appellant in this case was convicted in the second degree under an indictment charging him with the murder of Bent Blackburn, in Wheeler county, Texas, on the thirteenth day of February, 1887. The penalty imposed was a term of five years in the penitentiary.

Henry White, the first witness for the State, testified, in sub-stance, that he was in the barracks at Fort Elliot, Texas, on the

night of February 13, 1887. About seven o'clock on that night witness heard three shots fired a short distance off. He ran out of the barracks and met the defendant, who, he thought, had something like a pistol in his hand, but it was too dark for witness to be positive. Defendant was then going away from where Blackburn was then lying on the ground, about eight steps distant. Blackburn was then breathing hard, and died soon afterward, having been shot through the face, the ball entering about the region of the nose. The defendant said that he fired the fatal shot. The witness knew of no previous difficulty between the defendant and the deceased.

Private Val. Hopkins, company B, Twenty-fourth United States infantry, testified, for the State, that he was on guard at Fort Elliott at the time that Blackburn was killed. He heard three shots, and was ordered to investigate the cause of the shooting. He met the defendant about fifty yards from where Blackburn was killed. Defendant said: "I have killed Blackburn, and I am shot. I am going to the guard house." Sergeant Wilcox, who was then about five steps behind defendant, ordered him to halt. The deceased was a private and the defendant a non-commissioned officer in company F, Twenty-fourth United States infantry.

Cross examined, the witness stated that he knew nothing more about the killing than the defendant told him and as he had testified to in chief. Witness saw a fully cocked pistol lying on the ground within two or three feet of Blackburn's body. He did not touch the pistol, nor did he allow anybody else to do so, until Lieutenant A. A. Auger, officer of the day, arrived, when the witness picked the pistol up and delivered it to him. Profert was here made of a small "bull dog" pistol, which the witness identified as the one he found on the ground near Blackburn's body and delivered to Lieutenant Auger. Witness then went to the guard house and examined the defendant's clothing, but found no bullet hole in any part of his apparel. One of his hands and wrists were black, but witness was unable to say whether from powder burn or not. A brown or yellowish streak, somewhat resembling a scorch, was found on the wrist band of defendant's overcoat, but witness could not say that it was or was not caused by powder burn. At the guard house defendant told witness that the deceased rushed on him at the water barrel, saying: "I have got you now;" that he raised his hand to push deceased back, when deceased fired at him and he shot de-

ceased. The pistol now shown the witness (a much larger one than that found near the deceased's body) was the pistol taken from defendant by witness and turned over to Lieutenant Auger.

Sergeant Wilcox testified, for the State, that a few moments after the shooting he met the defendant near the body of the deceased, and ordered him to halt. Defendant refused to halt, remarking that he had killed Blackburn, and was going to the guard house. Witness repeated his order, and defendant halted. The witness identified the small bull dog pistol in evidence as one he saw near the body of deceased.

Asa Lewis testified, for the State, in substance, that he reached deceased about five minutes after the shooting, and saw the small pistol in evidence lying on the ground, about three feet from the deceased. On the Friday preceding the Sunday of the homicide, the defendant came into the dining room, then occupied by witness. He then struck the table with his fist, and said: "By G—d! I have lived long enough, and the old man has lived long enough." Just then the deceased passed the dining room window, and defendant resumed: "I will kill the son of a bitch, if he does not quit going to see Mrs. Mary Washington so often, after I have been running with her sixteen years! No son of a bitch in the Twenty-fourth infantry can down me!"

Cross examined, the witness stated that he was and had always been a friend of the defendant, but admitted that he was one of a committee which, some months before the homicide, drafted a series of resolutions condemning the defendant and recommending his dishonorable discharge from the army because of his neglect of duty, and of his failure to prevent the robbery of a railroad train. Witness, however, did not participate in the adoption of those resolutions because of dislike of the defendant. The witness denied that he testified before the examining court that, a short time before the homicide, the defendant and the deceased had words about the deceased's frequent visits to Mrs. Washington; whereupon the defense read from his evidence before the examining court, as follows: "A short time before the killing, Conner and Blackburn had some words about Conner going to Mrs. Washington's house so often." The three shots were fired very close together in point of time. A few seconds may have intervened between them.

Mrs. Mary Washington testified, for the State, in substance, that she was a widow and resided at Fort Elliot, Texas. She

had known the defendant since August, 1871, and had been his friend since 1872, and was still his friend. She had known the deceased since November, 1886. Witness's husband was absent during the months of January and February, 1886, during which time, at her husband's request, the defendant staid at witness's house. Witness took music lessons on the guitar from the deceased from November, 1886, until his death. Deceased was at the witness's house in the forenoon and in the evening of the fatal day. Defendant was there at the same time in the evening, but left at least ten minutes before the deceased left. When the deceased left his seat to go to the barracks, he remarked that he would go and play checkers with two soldiers named Boggs and Murtha. He then asked what time it was, and, when told that it was half past seven, he left, saying that he would play billiards until "last taps." About fifteen minutes later the witness heard three shots which were fired near the wood pile and water barrel, about forty yards from her house. She then saw deceased lying on the ground and not yet dead, and surrounded by people bearing lights. The witness never heard the defendant say that he would whip or kill deceased if he did not keep away from the witness's house.

The opinion of the court sets out the substance of the testimony of Major C. H. Carleton, except his identification of the two pistols in evidence as the two weapons delivered to him just after the homicide, by Lieutenant A. A. Auger. The smaller of these two pistols, the "bull dog," was loaded all around. Three chambers of the large pistol had been discharged.

The State next read in evidence the written testimony of Lieutenant A. A. Auger, taken upon the examining trial. The substance of it was that he was handed a small nickel plated pistol at or near the body of the deceased, just after the shooting. That pistol was loaded all round. Defendant was then in custody and was confined in the guard house. From the body the witness went to the guard house, when Sergeant Sperling, who had charge of the defendant, gave witness another pistol, three of the chambers of which were empty.

It was shown by other witnesses that the small "bull dog" pistol, when found near the body of the deceased shortly after the homicide, was full cocked, and was loaded all round. The vicinity of the wound in the defendant's face was flecked with powder grains.

The State closed.

One witness for the defense testified that he was a member of the jury of inquest, and examined the defendant's overcoat during that proceeding. He found a yellowish streak across the cuff of the left sleeve, made, he thought, by being lately singed. His left hand had the appearance of having been powder burnt. The witness, however, could not state positively that the discoloration of the left hand was powder burn.

The substance of the defendant's remaining witness's testimony was that, on the day of the homicide, the deceased came to him and completed the purchase of the small pistol in evidence, having had the same on trial since the second day before.

The motion for new trial raised the questions discussed in the opinion.

*Grigsby & Houston* filed an able and exhaustive brief for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

WHITE, PRESIDING JUDGE. On the trial, as a predicate for the introduction of the written testimony of the witness Auger, given at the examining trial of the defendant, and to show that said witness was beyond the jurisdiction of the court, the State proved by Major C. H. Carleton that he, the witness, was acquainted with Auger, who was, at the time of said examining trial, a lieutenant in Company F, Twenty-fourth United States infantry, and temporarily stationed at Fort Elliot, in Texas, which fort was under the command of the said witness Carleton. That "Company F, Twenty-fourth infantry," to which Auger belonged, "was then and now is stationed at Fort Sill, Indian Territory. Soon after he (Auger) testified (some five or six weeks ago), he was ordered to Fort Sill, Indian Territory, to join his company, and I supplied him with transportation for the journey, and he departed to join his company at Fort Sill, Indian Territory, in obedience to said order, and about three or four weeks ago, I received a telegram, signed A. A. Auger, announcing his arrival there, and saying when the transportation furnished him by me would return to Fort Elliot. The secretary of war, the department commander, or the commanding officer of any post at which he may be stationed, can order said Auger where they deem proper. There is a United States post at San Antonio, Texas, the headquarters of the Department of Texas.

For all I know, Lieutenant Auger may be at San Antonio, Texas, now. In fact I do not know whether he is within or without the borders of the State of Texas. His station and company is now stationed at Fort Sill, Indian Territory. When he left here he started for that post, and I do not know of his having been ordered elsewhere. When he was here we were short of officers, and he was sent from here to Fort Elliot temporarily."

From this testimony it would appear that the witness Auger's permanent residence, if he had one, was at Fort Sill, in the Indian Territory, and that his stay at Fort Elliot, Texas, was only for a temporary purpose, which purpose having been accomplished, he left to return to his place of permanent residence, to wit, Fort Sill, in the Indian Territory. It is judicially known to this court that the Indian Territory is beyond the jurisdiction of Texas. (Swofford v. The State, 3 Texas Ct. App., 76.) Under the statute a predicate for the introduction of such testimony as that proposed in this case is sufficiently laid when it is shown that a witness resides either out of the State, or that he has removed beyond the limits of the State. (Code Crim. Proc., art. 772; Evans v. The State, 12 Texas Ct. App., 370; Pinckney v. The State, Id., 352; Garcia v. The State, Id., 335; Parker v. The State, 18 Texas Ct. App., 72.) The fact that a party is beyond the jurisdiction of the court, or beyond the limits of the State, may, as any other fact, be established by circumstantial evidence. We are of opinion that the predicate was sufficiently laid down for the introduction of the testimony as above stated, and that the court did not err in so holding.

In connection with this testimony, however, the appellant reserved another bill of exceptions, and strenuously insists that the court erred in permitting the witness Carleton to testify, as he did, over objection of defendant, to the receipt by him of a telegram from Lieutenant Auger, after the latter had reached Fort Sill, and which fact was made an important circumstance to show that Auger was in fact at Fort Sill, in the Indian Territory. Two objections were urged in regard to this testimony. First, because original telegram was the best evidence; and, second, because the State having failed to produce the original, the secondary evidence of the contents of the dispatch was inadmissible.

We admit that, as to contracts, and where it is sought to render parties directly interested in the subject matter liable on account of communications by telegrams, the appropriate pri-

mary evidence, in strictness, would ordinarily be the original message delivered to the telegraph company by the sender, or the transcript delivered by the company to the receiver. (Abb. Trial Ev., 290; 2 Whart. Ev., 2 ed., sec. 1128; Williams v. Brickell, 37 Miss., 682; Matteson v. Noyes, 25 Ill., 591; Comm. v. Jeffries, 7 Allen, Mass., 548.) But this rule obtains only when the contents of the telegram become essential in determining the rights of parties; whereas in this case the object sought was not to prove the contents of the telegram, but the independent fact that Carleton had received the same, purporting to be from Lieutenant Auger. We see no reason why this could not be done by parol evidence, without the necessity of producing the telegram itself. At best, the fact of his receipt of the telegram was but a circumstance tending to establish the main fact, and the contents of the telegram were not the matters sought to be established. The contents of the dispatch would have added no weight to the fact, nor have determined the fact that he had or had not received the telegram; and the fact that he had received such a telegram could be stated by him without the necessity of producing the telegram. (Kennedy v. The State, 9 Texas Ct. App., 620.) We are of the opinion that there was no error in the ruling of the court in admitting all the testimony of the witness Carleton, going to establish a predicate for the admission of the testimony of Auger. This disposition of the main question relieves us of the necessity of discussing the several other bills of exceptions contained in the record with regard to the acts and rulings of the court complained of growing out of the admission of this testimony.

The seventh error complained of is that the court erred in instructing the jury upon the law of murder in the second degree, and in submitting murder in the second degree as an issue in the case. The correct rule is, that to relieve the trial judge of the duty of charging upon lower degrees of culpable homicide, the evidence must establish the highest degree; for, if there be reasonable doubt it must be solved by the jury and not by the court. This rule applies to all cases in which the greater includes the lower degree of culpability. (Benevides v. The State, 14 Texas Ct. App., 378.) It is error to charge the jury that they must either convict of murder in the first degree or acquit, if by any possible legitimate construction of the evidence the jury might have found the defendant guilty of murder in the second degree. (Edmundson v. The State, 41 Texas, 496.) And

the Supreme Court of this State has even gone so far as to hold in one case, that where the evidence established murder in the first degree, it was not error of which the accused can complain that the court charged the jury that they might find the defendant guilty of murder in the second degree, or of manslaughter. (Benevides v. The State, 31 Texas, 579.) The rule laid down in Saunders v. The State, 41 Texas, 306, is that a failure to define murder in the second degree, in a case where the jury upon the evidence might have found the defendant guilty of the less offense will be cause for reversal, whether the instructions were asked or not. In the case in hand the jury have found the defendant guilty of murder in the second degree, under the charge of the court submitting that degree to them.

With regard to the sufficiency of the charge of the court upon self defense, which is also complained of as error on the part of the appellant, the objection uged is that, in reference to reasonable appearance of danger, the court omitted to instruct that such reasonable appearances were to be judged of from the standpoint of defendant. The rule contended for is well settled that a defendant has the right to have the appearances judged of from his own standpoint. (Patillo v. The State, 22 Texas Ct. App., 586, and authorities cited.) No special instruction to this effect, however, was asked by defendant. As given, the charge of the court presented the law applicable to the facts of this case, in the language of the statute.

We have discussed all the material questions in the case, and having found no reversible error, the judgment is affirmed.

*Affirmed.*